

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 38th Floor*
*New York, New York 10278*

July 12, 2024

**By ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

    Re:    *United States v. Boss Terrell*, 22 CR 343 (JMF)

Dear Judge Furman,

    The Government respectfully submits this letter in advance of the defendant's sentencing, currently scheduled to proceed on Tuesday, July 16, 2024, at 2:30 PM. For the reasons set out below, the Government submits that a sentence at the top of the range of 292 to 360 months applicable under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing, in particular here, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to avoid unwarranted sentence disparities among defendants, and to protect society from further crimes of the defendant.

## Background

### 1. Background on WashSide, a/k/a "Wash," and "Everything4DayDay," a/k/a "E4D"

    The defendant was a member of a violent street gang known as "WashSide" or "Wash." He was also an associate of a subset of "Wash," known as Everything4DayDay or more commonly E4D. (Presentence Investigation Report dated Apr. 18, 2024 ("PSR") ¶ 38). Wash was based in the neighborhood in the vicinity of the intersection of Washington Avenue and East 169th Street in the Bronx from at least 2015 through 2022. (PSR ¶ 39). This neighborhood runs along its namesake Washington Avenue and encompasses the Morris Houses, a large public housing development that lies on both sides of Washington Avenue between East 169th Street and East 170th Street. (PSR ¶ 39). Members of Wash were largely current or former residents of this neighborhood who publicly professed loyalty to the neighborhood and each other through public social media posts. (PSR ¶ 39).

    Members of Wash participated in numerous violent acts, including acts of violence against rival gang members and robberies, as well as transported stolen property interstate as part of a

wide-ranging campaign of pillaging numerous commercial establishments stretching from New England throughout the Northeast, Mid-Atlantic, South, and Midwest, sold controlled substances, and stole credit and debit cards for the purpose of committing wire and access device fraud. (PSR ¶ 40).

Wash consisted of a core membership that shared the common aims of protecting the territory of the gang, enriching the members of the gang through robbery, larceny, fraud, and drug trafficking, and enhancing the reputation of the gang by engaging in acts of violence against members of rival gangs. (PSR ¶ 41). Wash controlled the territory of its neighborhood where only its members and associates were permitted to congregate and move freely and sell drugs. (PSR ¶ 41). The members of Wash were expected to make money for the gang and to engage in acts of violence to protect the gang's territory and to target the members of rival gangs. (PSR ¶ 41). When members of Wash committed acts of violence, they gained heightened status within the gang, in that other members and associates respected the members who committed the violence more because of their acts of violence. (PSR ¶ 41). Additionally, members of Wash advertised the gang and glorified its criminal activities through social media posts. (PSR ¶ 41).

In this respect, the defendant himself regularly posted multiple video recordings and photographs reflecting his status as a member of Wash for multiple years leading up to his arrest in or about June 2022. Indeed, one of the social media accounts that the defendant used throughout this time period was a Facebook account titled "OWA Boss," an acronym used by multiple members of Wash for "Only Washington Avenue."

As stated above, Wash had rival gangs, which its members referred to as "opps," and which were similarly rooted in nearby neighborhoods. (PSR ¶ 43). From 2015 to 2022, members of Wash and members of other local rival gangs would initiate violence against each other whenever and wherever they saw one another, whether in one another territory's or elsewhere. (PSR ¶ 44). The members of Wash and the rival gangs, including the defendant, as discussed further below, would then post on social media to brag about their shootings, taunt one another and promote their respective gangs on a regular basis.

Members of Wash armed themselves and committed multiple acts of violence against rival gang members, including killing a rival gang member, Tyrone Almodovar, on June 26, 2022, a murder which the defendant caused and which is further discussed below. (PSR ¶¶ 45-51). Wash members attempted to kill other rivals on numerous occasions, including a shooting that the defendant himself committed on July 29, 2020, which is further discussed below (PSR ¶¶ 55-58), a shooting on August 31, 2021, which involved two young women being shot in the legs (PSR ¶¶ 66-67),[1] and a shooting on August 19, 2022, where an innocent man was shot (PSR ¶¶ 73-77). On at least one occasion, Wash members viciously attacked and beat a rival gang member, kicking and stomping his head and thereafter slashing him in the back. (PSR ¶ 65). Wash members also participated in a violent armed robbery, where innocent store employees were thrown to the ground

---

[1] The Government respectfully requests that the second sentence of PSR ¶ 647 be revised to state, "The two young women were both taken to hospital, one by ambulance and one by a private car before an ambulance arrived."

and had firearms pressed to their heads, (PSR ¶¶ 52-54),[2] two violent, armed carjackings (PSR ¶¶ 68-72), and the robbery and theft of numerous businesses in New York and beyond, as stated above, which stretched from New England throughout the Northeast, Mid-Atlantic, South, and Midwest (PSR ¶¶ 40, 59-62, 78-79). Particularly during the height of the pandemic in 2020 and 2021, members of Wash, including the defendant, were regularly driving out from the city and the state in small bands to steal electronic goods, typically iPhones, iPads, and their accessories, from chain retailers such as Best Buy, Target, T-Mobile, and AT&T. The members of Wash and their associates typically just walked into a store, identified where such goods were located, and then broke them out of display cases, striking and throwing to the ground any store employees or members of the public who offered resistance, sometimes with significant violence. (PSR ¶ 78). In total, members of Wash took merchandise in excess of $250,000 from at least nineteen states, often hitting several stores on a single day and typically returning to New York City after extended campaigns to sell their raiding spoils to a small number of resellers of stolen goods with whom they worked on a collective basis. (PSR ¶ 79).

Finally, from at least 2015 through 2022, Wash members, including the defendant, regularly stole credit and debit cards from movie theatre patrons, and then used the stolen cards to purchase electronic goods and luxury clothing, resulting in more than $150,000 of fraudulently obtained goods. (PSR ¶¶ 80-81).

   2. **Terrell's Participation in the June 26, 2020 Murder**

On the evening of June 26, 2020, amidst the height of the coronavirus pandemic, the defendant and Co-Defendants Yaurel Centeno, Lydell Seymore, and Darrell Spencer, among other members of Wash, were congregated on the street in front of 3480 Third Avenue in the territory of Wash. (PSR ¶ 46). There, Tyrone Almodovar, a/k/a "Benji," a member of Six Third, a rival gang of Wash based in a nearby public housing development, drove past the members of Wash inside a taxi. (PSR ¶ 46). As Almodovar passed, he opened his window and shouted "Boss SMD" (*i.e.*, "Boss Terrell Suck My Dick") and then "WashK" (*i.e.*, "Wash Killer"). (PSR ¶ 46). In response, the defendant stated, "Who's going to do it?" after which Seymore, who entered the defendant's parked car, stated, "Give it to me." (PSR ¶ 47). At the time, the defendant's question amounted to a direction for one of the members of Wash who was present to shoot and kill Almodovar. Seymore's response referred to a firearm, specifically a black pistol that the defendant possessed earlier in the evening and supplied to Seymore. (PSR ¶ 47). With Seymore in the car, the defendant then drove off in pursuit of the taxi. (PSR ¶ 47). In short order, Spencer entered his car and followed the defendant, after which Centeno entered his car and followed the defendant and Spencer. (PSR ¶ 47).

After racing for several blocks, the three cars that members of Wash were driving boxed in the taxi. (PSR ¶ 48). In particular, the taxi momentarily came to a stop with Spencer's car having cut off the taxi with Spencer's car directly in front of the taxi, almost perpendicular to the

---

[2] The car that Co-Defendants Yaurel Centeno, Isaiah Thomas, Jacob Baker, and Tyshawn Brogdon used to commit this pawnshop robbery on June 27, 2020 was the defendant's car, which the defendant had driven the night before the robbery during the murder of Tyrone Almodovar on June 26, 2020.

direction of traffic on East 168th Street, and preventing the taxi from driving forward. (PSR ¶ 48). The defendant's car pulled up to the side and rear of the taxi on the right side, preventing it from moving backwards in that direction. (PSR ¶ 48). As the taxi began to back straight up, the taxi hit Centeno's car, which had pulled up immediately behind the taxi to block it further. (PSR ¶ 48). At this time, Seymore held the black pistol out of a window of the defendant's car and shot once or twice, hitting Almodovar, who was still seated in the taxi, in the head. (PSR ¶ 48).

A short time later, members of the NYPD responded to a crime scene at the intersection of East 163rd Street and Tinton Avenue in the territory of Six Third where the taxi had driven and stopped after the shooting. (PSR ¶ 45). The members of the NYPD found Almodovar in the taxi, dead of a fatal gunshot wound to his head that substantially blew apart one area of his skull. (PSR ¶ 45).

The brutal attack occurred within the context of mounting violence between Six Third and Wash and Almodovar and the defendant, in particular. In 2019, Almodovar and another member of Six Third had attacked the defendant, ripping out one of his dreadlocks, which inspired a posse of members of Wash, including the defendant, to return the following day to launch an attack in the territory of Six Third where they were scattered by gunfire. (PSR ¶ 49).

In the immediate wake of the murder and in the months and years that followed, members of Wash publicly and privately celebrated their killing of Almodovar with a recurring emphasis on language that demeaned the rival whom they killed. (PSR ¶ 50). In multiple sentencing submissions for Co-Defendant's Antwan Mosley, Mamadou Diallo, and Isaiah Thomas we have provided examples of these dark public celebrations, in which the defendant himself participated on a regular basis. For example, on October 23, 2020, approximately four months after he caused Almodovar's murder, the defendant posted on one of his social media accounts, "Benji got His Muffin Cap Pealed Back" in a reference to Almodovar's alias, "Benji," and the fact that Almodovar was killed by a fatal gunshot wound to his head that substantially blew apart one area of his skull. (PSR ¶ 50). The defendant signed off the same post with the benediction of "Rest in Piss," a foul play on "Rest in Peace." In addition, in private and amongst one another, the members of Wash, including the defendant, regularly used the phrase "smokin' Benji" to describe their present status, as the defendant described his own status in a recorded jail call between the defendant and Co-Defendant Isaiah Thomas on August 5, 2020. (PSR ¶ 51).

### 3. Terrell's Participation in the July 29, 2020 Attempted Murder

On July 29, 2020, a short time after midnight, a group of rival gang members shot an associate of Wash in the arm in the vicinity of East 169th Street and Washington Avenue in the territory of Wash. In retaliation for this initial shooting, the defendant, who was present on the street at the time of the initial shooting, pursued the group of rival gang members with premeditation and fired a gun multiple times at them as they fled the territory of Wash. In video recordings obtained from surveillance cameras in the vicinity of the intersection of East 169th Street and Fulton Avenue, the defendant is shown shooting down the middle of the street at a trio of young men sprinting away, two of whom are identifiable in the video recordings as members of Spectway, another rival gang of Wash. (PSR ¶ 56). When members of the NYPD arrived at that intersection, they found seven shell casings in the vicinity of the same place where the defendant was depicted shooting a firearm. (PSR ¶ 55).

Approximately one month later, on August 29, 2020 in a recorded jail call with Co-Defendant Yaurel Centeno, the defendant discussed his ongoing involvement in the same violent rivalry between Wash and Spectway. In the recorded telephone conversation, the defendant informed Centeno, that the prior evening, on August 28, 2020 or August 29, 2020, the defendant and Co-Defendant Lydell Seymore had been out all night "spinning" the "opp blocks," driving through "Six Third" and then "Six Sev," a reference to Spectway, which is also known as Sevway (*i.e.*, Six Sev or Sev for Seventh or 167th for East 167th Street). The defendant continued to describe how at one point, Seymore performed a U-turn, at which point Terrell lowered the window and the "opps" all started to panic and run. (PSR ¶ 57).

4. **Terrell's Participation in Robberies and Larcenies Outside New York City**

As stated above, the investigation of Wash identified numerous robberies and larcenies committed outside New York City for which small bands of Wash members and Wash associates were the perpetrators at so-called "big box" retailers and other chain stores selling high-value and fungible digital devices, such as iPhones, iPads, and their accessories. The defendant joined these raiding parties, as evidenced through posts on social media over multiple years that depict him together with other members of Wash displaying the products and cash proceeds of this sustained lawlessness and also through his participation in one particular foray on August 5, 2020.

On that date, the defendant participated in a recorded jail call with Co-Defendant Isaiah Thomas, with whom he discussed a robbery that he and three other members of Wash, Co-Defendants Yaurel Centeno, Jacob Baker, and Darrell Spencer, were about to commit at a Best Buy in Warwick, Rhode Island and their planned resale of any stolen merchandise through one of the principal resellers of stolen goods for Wash. (*See* PSR ¶¶ 59-62). A short time after this jail call, members of the Warwick Police Department in Warwick, RI stopped Spencer's car and detained the defendant, Centeno, Baker, and Spencer on suspicion of their involvement in a robbery that had just occurred at a Best Buy in Warwick, RI. In particular, the Warwick Police Department had received a report from the Best Buy that three males, later identified as the defendant, Centeno, and Baker, had entered the Best Buy a short time earlier. Once inside the store, Baker asked an employee for assistance looking at Apple AirPods, which were displayed in a locked case. As the employee opened the case, Baker pushed him aside, at which point the defendant ran up to the case, grabbed a quantity of Apple AirPods, and ran out of the store, followed by Baker, who also grabbed a further quantity of Apple AirPods. After watching the defendant, Centeno, and Baker meet in the parking lot and flee in Spencer's car, the employees of Best Buy provided the description of Spencer's car to the Warwick Police Department, resulting in the stop of Spencer's car, in which police officers found the stolen Apple AirPods. Baker and the defendant were later identified in a "show up" with the employee whom Baker assaulted. (PSR ¶ 60). After their arrests were processed, the defendant, Centeno, and Banker were released from the Warwick Police Department and proceeded directly that same evening to break into a gas station convenience store next to the police station, which they proceeded to ransack, disturbing merchandise displays and attempting to take the cash register. (PSR ¶ 62).

5. **Procedural Background**

On or about December 14, 2022 a grand jury sitting in the Southern District of New York voted a superseding indictment (the "S1 Indictment") against the defendant and his ten co-

defendants, charging the defendant with one count of participating in a racketeering conspiracy from at least 2015 up to and including December 2022, in violation of 18 U.S.C. § 1962(d) ("Count One"); one count of participating in a conspiracy to commit murder in aid of racketeering on June 26, 2020, in violation of 18 U.S.C. § 1959(a)(5) ("Count Two"); one count of murder in aid of racketeering on June 26, 2020, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 ("Count Three"); one count of using a firearm for murder on June 26, 2020, in violation of 18 U.S.C. §§ 924(j) and 2 ("Count Four"); one count of attempted murder and assault with a dangerous weapon in aid of racketeering on July 29, 2020, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1959(a)(3), (a)(5), and 2 ("Count Five"); and one count of using and carrying a firearm during and in relation to and possessing a firearm in furtherance of a crime of violence, which firearm was brandished and discharged, on or about July 29, 2020, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii) and 2 ("Count Six").[3]

On January 26, 2024, the defendant entered a referred change of plea before the Honorable Sarah Netburn, United States Magistrate Judge for the Southern District of New York, to Count Two and Count Five of the S1 Indictment. (PSR ¶ 30). On January 29, 2024, the Court accepted the plea.

In terms of the defendant's adjustment to incarceration, the defendant has received multiple disciplinary sanctions following serious violations from in or about January 2023 to December 2024, which are set forth in the PSR and further detailed in the incident reports obtained from the Bureau of Prisons and enclosed as Exhibit A (*See* PSR ¶ 33-36). As detailed in these incident reports, on January 3, 2023, a corrections officer found a bladed weapon fashioned from plastic on the defendant's person. Thereafter, on April 17, 2023, a search of his cell found a cellphone and a corresponding charging cable hidden inside the defendant's mattress. Finally, as also referenced in the PSR (*see* PSR ¶ 34), on October 12, 2023, the defendant, together with multiple other inmates at the MDC, including Co-Defendants Tyshawn Brogdon and Rasheed Chapman, participated in a very serious attack upon one other inmate, who was assaulted on the recreation deck of a housing unit. After the victim of that attack had become involved in a fight with two other inmates, the defendant, together with Brogdon, Chapman, and five other inmates entered the fight, striking the victim with closed fists to the head and torso. During this coordinated attack, which arose from an apparent dispute over the use of the telephone, members of the MDC's staff observed the defendant in surveillance camera video recordings remove a weapon from his waistline and use it to stab the victim in the abdomen. After the MDC's staff secured the victim, he was found to be bleeding from a stab wound to his abdomen. Given the severity of his injuries, including the stab wound, the victim was transported to a hospital for medical treatment.

In terms of the defendant's criminal history, the Government concurs with Probation that the defendant has no history of arrests and prosecutions that resulted in prior convictions. (*See* PSR ¶¶ 121-127).

---

[3] The defendant was initially charged alone in *United States v. Boss Terrell*, 22 CR 343 (JMF), which alleged substantially the same but not all the counts later brought in the S1 Indictment. The defendant was arrested on June 23, 2022 and has remained detained in the interim at the Metropolitan Detention Center ("MDC").

**6. Co-Defendants Background**

To date, the Court has sentenced four co-defendants, and seven co-defendants remain to be sentenced, plus the defendant, as the table below summarizes.

|     | Defendant (Age) | Count(s) of Conviction | Principal Admitted Conduct | Guidelines Range | Sentence |
| --- | --- | --- | --- | --- | --- |
| 1 | Boss Terrell (23) | 1959(a)(5)<br>1959(a)(3), (5) | Murder-1 (Shooting)<br>Att. Murder-1 (Shooting)<br>Interstate Stolen Goods | 292 to 360 Months | 07/16/2024 |
| 2 | Yaurel Centeno (22) | 1962(d)<br>1959(a)(5) | Murder-1 (Shooting)<br>Interstate Stolen Goods<br>Multiple Robberies | 360 Months | 07/31/2024 |
| 3 | Lydell Seymore (20) | 1962(d)<br>2314 | Murder-1 (Shooting)<br>Interstate Stolen Goods<br>Carjacking | 292 to 360 Months | 07/30/2024 |
| 4 | Darrell Spencer (26) | 1962(d) | Murder-1 (Shooting)<br>Interstate Stolen Goods | 240 Months | 08/07/2024 |
| 5* | Isaiah Thomas (25) | 1959(a)(3), (5)<br>924(c)(1)(A)(i)<br>924(c)(1)(A)(i) | Att. Murder-1 (Shooting)<br>Robbery<br>Interstate Stolen Goods | 330 to 382 Months | **06/03/2024**<br>**192 Months** |
| 6 | Jacob Baker (20) | 1962(d)<br>924(c)(1)(A)(i) | Att. Murder-1 (Shooting)<br>Att. Murder-1 (Shooting)<br>Interstate Stolen Goods<br>Carjacking<br>Robbery | 228 to 270 Months | 07/31/2024 |
| 7 | Tyshawn Brogdon (21) | 1962(d)<br>924(c)(1)(A)(i) | Carjacking<br>Robbery<br>Wire Fraud | 147 to 168 Months | 07/24/2024 |
| 8 | Rasheed Chapman (20) | 1959(a)(3), (5)<br>924(c)(1)(A)(i) | Att. Murder-1 (Shooting)<br>Wire Fraud | 181 to 211 Months | 07/30/2024 |
| 9 | Mamadou Diallo (24) | 1962(d) | Carjacking<br>Interstate Stolen Goods | 120 to 150 Months | **05/30/2024**<br>**84 Months** |
| 10 | Antwan Mosley (22) | 1959(a)(3), (5)<br>924(c)(1)(A)(i) | Att. Murder-1 (Shooting)<br>Interstate Stolen Goods<br>Wire Fraud | 181 to 211 Months | **05/14/2024**<br>**120 Months** |
| 11** | Noel Car (23) | 1959(a)(3)<br>1028A | Agg. Assault (Slashing)<br>Wire Fraud | 151 to 188 Months | **06/10/2024**<br>**70 Months** |

\* On June 17, 2024, Co-Defendant Isaiah Thomas filed a notice of appeal of the judgment.

\*\* Among the co-defendants, Co-Defendant Noel Carr is the only co-defendant whose status as a career offender under U.S.S.G. § 4B1.1 set the applicable range under the Guidelines. In his case, the Government further recommended a below-Guidelines sentence of 84 months. Finally, the sentence imposed of 70 months was set consecutive to an undischarged term of imprisonment imposed in unrelated state court proceedings of approximately nine months.

**Applicable Law**

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

The statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, pursuant to which the sentence needs::

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and
(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

While a district court may not presume that an appropriate sentence lies within the Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a district court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

### **Sentence**

The Government respectfully submits that a sentence at the top of the applicable range under the Guidelines, a substantial sentence in the vicinity of the statutory maximum of 30 years' imprisonment, is warranted given the seriousness of the offense conduct and in turn the need to provide just punishment and promote respect for the law. The defendant, notwithstanding the fact that he did not pull the trigger that killed Tyrone Almodovar, is the person most responsible for that killing from the perspective of the Government. If not for the response of the defendant to pointed and profane but literally passing abuse shouted from a moving car, then Tyrone Almodovar would not have died on June 26, 2020. To be sure, Co-Defendant's Yaurel Centeno and Darrell Spencer and perhaps most of all Lydell Seymore were all essential actors in the murder, too. They were all propelled and led into action, however, by the call for an immediate reprisal from the defendant, a direction to kill accompanied by the literal arming of a volunteer. If instead of taunting the members of Wash with hurled insults at the defendant, Tyrone Almodovar had instead himself shot at the gathering from the taxi in a drive-by shooting, the ensuing pursuit, catch, and murder would still shock as a horrific and brutal crime. But it is entirely incomprehensible, an unconscionable tragedy, that the killing came in response to such light provocation. For us to function as a society of law and order, we must affirm whenever such tragedies occur that crimes that take a human life, particularly under such gratuitous circumstances, are different and must be approached differently in their prosecution and punishment. Above all else, our criminal laws prize and defend each human life, and the basic covenant that brings us together under those laws cannot hold if we do not honor premeditated murder, let alone premediated murder that is committed by a hunting pack of gang members in the middle of a public street, with the strongest resolve and stiffest punishment.

There are multiple further arguments, some based in the Guidelines and others the factors of § 3553(a), all of which are rooted in the defendant's offense conduct, that similarly militate in favor of the requested sentence.

In terms of the Guidelines, it is perhaps most respectfully termed a "quirk" of the Guidelines approach to the grouping of counts that its prescribed calculus results in the complete erasure from the defendant's offense level of an attempted first-degree murder, whose group offense level is 33, committed after a first-degree murder, whose group offense level is 43. Regardless, the Guidelines acknowledge this possible "quirk" and how the Court can, consistent with the Guidelines, address it. In the commentary to U.S.S.G. § 3D1.4, the Guidelines provide, "[i]n unusual circumstances, the approach adopted in this section could produce adjustments for the additional counts that are inadequate or excessive. If there are several groups and the most serious offense is considerably more serious than all of the others, there will be no increase in the offense level resulting from the additional counts. Ordinarily, the court will have latitude to impose added punishment by sentencing toward the upper end of the range authorized for the most serious offense." It should not and cannot be the case that a *very serious* shooting, an admitted, albeit unsuccessful, effort to kill multiple people by firing more than a half-dozen shots along a public street, does not impact the offense level and in turn the sentence for a defendant under the rubric of the Guidelines, and as this commentary makes clear, the approach to avoiding this result is the requested sentence.

The Government's requested sentence also takes into consideration both the defendant's lack of criminal history and his relative young age, as he was 19 when he participated in both shootings as well as the out-of-state robbery detailed on this record.[4] The Government considered both those issues in agreeing to a disposition that statutorily capped the defendant's sentence, which otherwise would have involved a statutory and Guidelines sentence of life imprisonment for the precise conduct that he has now admitted. Any argument that the defendant's lack of criminal history favors a lesser sentence is also substantially undercut for two reasons given the record of the instant offense conduct. *First*, the defendant was a member of Wash for years and thus, as stated in a prior sentencing submission, for years, the defendant's daily existence was antithetical to a law-abiding life, choosing, like his co-defendants, his allegiance to his fellow gang members over any regard for the law or the other members of his community, who were subjected to regular threats of violence, and others in faraway places whose lives were briefly but violented disrupted in a manner that was shocking and deeply upsetting. *Second*, the sequence of the shootings that the defendant committed in the summer of 2020 is also important. After directing a pre-meditated killing, the defendant, approximately one month later and only a small number of blocks away in the territory of Wash acted again with the intent to take multiple lives. Thus, the defendant's offense conduct was actually spread across years, the opposite of a one-time occurrence that the lack of criminal history might call to mind. And furthermore, rather than reacting with shock or dismay, not to mention a modicum of remorse, after causing the death of another person, the defendant after a period of repose, recommitted himself to the very same aim.

This last point illustrates how from the perspective of specific deterrence and the need to protect the public, a sentence at the top of the Guidelines is not only justified, it is necessary. In short, the defendant has shown himself to be a determinedly dangerous person, who will harm others when at liberty and for whom the experience of taking a life was not a cautionary experience but rather a cause for celebration. In considering this need to ensure specific deterrence and to protect the public from further crimes of the defendant, the defendant's conduct while in custody on this offense is further alarming and reflects his ongoing danger to the community. The response to the defendant of being caught in possession of a deadly weapon in January 2023 was to use a deadly weapon to harm another inmate in December 2023. The impulse to recidivate even when incarcerated for the most serious of crimes highlights why the defendant must be separated from society.

As for general deterrence, as the Government has emphasized in connection with prior sentencings in this case, the very public celebration of acts of violence, particularly the murder of Tyrone Almodovar, that the members of Wash, including the defendant, engaged in for months and years after their occurrence, highlights the importance of a sentence here to restoring the public perception of the consequences for such violence, particularly the taking of a human life. The defendant of course grotesquely joined in the celebration of Tyrone Almodovar's killing, referring

---

[4] With that said, the dialogue around criminal history must be fairly rooted in convictions, not arrests. In this respect, the instant offense does "represent[ ] the defendant['s] first conviction," but *not* his "second arrest." (PSR at 43). The defendant has been arrested on multiple other occasions both inside and outside New York City. The Government seeks to make no affirmative point based on these arrests but also wishes to make clear that the opposite inference should not be drawn based upon a mistake of fact.

to the gruesome manner of his death—"Benji got His Muffin Cap Pealed Back"—several months later. There are many, many people, particularly many, many young people, who saw that post on social media and who more broadly witnessed the self-mythologizing and yet simultaneously trivializing treatment of death that the members of Wash and the defendant acted out in the literal and digital public squares of their community. A very substantial sentence here will resonate in a way that restores some balance to how those many people, those many young people, conceive of the reality and the consequences for murder.

In closing, the Government is sympathetic to the self-reported circumstances of the defendant's childhood, which are mildly corroborated in the PSR's collateral interview with one of the defendant's parents. (*See* PSR ¶ 135). The defendant describes a difficult upbringing in a troubled family amidst what is indisputably a neighborhood with elevated criminal activity, as his counsel references. The defendant also raises self-reported substance abuse as a mitigating factor. (*See* PSR ¶ 144-47). Based on these alleged circumstances—for which the Government always conveys its compassion and its condolences whenever and wherever it encounters them in connection with investigating and prosecuting crime—the defendant and Probation recommend an incarceratory sentence of 240 months' imprisonment, 52 months, more than four years, below the minimum of the Guidelines range. The Government respectfully submits that the circumstances of the defendant's childhood, which as reported are sadly not extraordinary and indeed are shared by *thousands and thousands* of law-abiding citizens in the South Bronx, cannot support such a substantial downward variance, which would require a commensurate rationale that exists nowhere in this record, let alone in a case where the defendant is guilty of murder and attempted murder.

As the Government will continue to repeat in connection with sentencing in this case, the argument that the defendant is a product of a difficult childhood, growing up in a low-income and violent neighborhood and amidst purportedly volatile family circumstances, ignores the fact that the overwhelming majority of citizens who are raised in the South Bronx face many of the same conditions and challenges as the defendant, if not worse, and yet choose to live honest, law-abiding lives from the outset of their young adulthood, attending school and working to maintain lawful employment in the hope of improving their own lives and those of their families. The defendant instead chose, day after day, to involve himself with a violent gang and to make money by stealing from people who were trying to live honest, law-abiding lives. He caused one life to be taken and attempted to take more. He must answer for it all now.

## Victims

At this time, the Government anticipates that up to two representatives of Tyrone Almodovar will appear and request to be heard at sentencing.

## Restitution

As the Government has previously stated in connection with this case, the Government is acutely conscious of its responsibility not only to the public but also to the specific victims of crimes, particularly violent crimes, at the time of sentencing. The Government is working with the family and representatives of Tyrone Almodovar as well as multiple companies from whom the defendant himself stole merchandise, including Best Buy, to ascertain their compensable

losses. For this reason, the Government respectfully requests that the Court set October 14, 2024 as the date for the final determination of any victims' losses pursuant to 18 U.S.C. § 3664(d)(5).

## Conclusion

For the reasons set out above, the Government respectfully requests that the Court impose a sentence of imprisonment at the top of the applicable Guidelines range of 292 to 360 months in order to reflect the seriousness of the offense, promote respect for the law, ensure adequate specific and general deterrence, and protect the public. Given the extended duration of the offense conduct and the defendant's demonstrated recidivism, the Government respectfully requests that the Court further impose the maximum sentence of supervised release of three years.

Respectfully,

DAMIAN WILLIAMS
United States Attorney

By: *Thomas John Wright*
Courtney L. Heavey
Thomas John Wright
Assistant United States Attorneys
(212) 637-2413 / 2295

cc: Anthony L. Ricco and Bruce D. Koffsky (Counsel to Defendant Boss Terrell) (by ECF)